UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-20378-CR-MARTINEZ/AOR

UNITED STATES OF AMERICA,

v.

NICK RICKEY CHOUTE,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant Nick Rickey Choute's ("Defendant" or "Choute") Motion to Suppress Custodial Statements (hereafter, "Motion to Suppress") [D.E. 16]. This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 17]. The undersigned held an evidentiary hearing on this matter on October 13, 2017 [D.E. 26]. For the reasons stated below, the undersigned respectfully recommends that Choute's Motion to Suppress be DENIED.

## PROCEDURAL BACKGROUND

On June 1, 2017, Choute was charged in a five count indictment with the following offenses:

| | |
|---|---|
| Count 1: | Use of One or More Unauthorized Access Devices from January 16, 2015 through July 13, 2015 in violation of 18 U.S.C. § 1029(a)(2). |
| Count 2: | Possession of Fifteen or More Unauthorized Access Devices on March 15, 2016 in violation of 18 U.S.C. § 1029(a)(3). |
| Counts 3-5: | Aggravated Identity Theft on March 15, 2016 in violation of 18 U.S.C. § 1028A(a)(1). |

See Indictment [D.E. 1].

On March 15, 2016, federal agents executed a search warrant at Choute's residence, 565 N.E. 158th Street, Miami, Florida. At the time of the search, Choute was asked a number of questions regarding him and the other occupants of the residence (hereafter, "the Interview"). Choute's responses to these questions were memorialized in a Memorandum of Interview. See Memorandum of Interview [D.E. 16-1 at 2-3]. Choute does not seek to suppress his answers to ten of the fourteen questions he was asked. However, he seeks to suppress the following statements from the Interview, on the grounds that law enforcement obtained them without giving him Miranda warnings:

> 10. Choute's room is located on the right side of the house on the left.
>
> 11. Kerby Choute's room is located on the right side of the house on the right.
>
> 12. Kervens Choute's room is located in the back of the house and is locked.
>
> 13. Choute's parents' room is located on the left side of the house.

See Memorandum of Interview [D.E. 16-1 at 2].[1]

The government counters that Choute's non-Mirandized statements are not subject to suppression because: (1) he was not in custody at the time; and (2) the questions were routine booking questions. See Government's Opposition to Defendant Choute's Motion to Suppress Statements [D.E. 19].

## APPLICABLE LAW

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 2. In Miranda v. Arizona, the United

---

[1] Kerby Choute and Kervens Choute are Choute's siblings.

2

States Supreme Court held that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." 384 U.S. 436, 467-68 (1966). "Once warnings have been given . . . [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74. The Miranda Court "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004).

1. **Custody**

A person is in custody for Miranda purposes only "when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006). See also United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (holding that whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave"). The test is objective, and the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).

The Court must consider several factors in determining the existence of custody, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2012) (citations omitted). Moreover, courts are much less likely to find a custodial encounter when the questioning is brief and occurs "in familiar or

at least neutral surroundings, such as the suspect's home." United States v. Luna-Encinas, 603 F.3d 876, 882 (11th Cir. 2010) (citations omitted) (holding that a five-minute encounter in the defendant's front yard during a search of his residence was not custody for Miranda purposes).

## 2. Routine Booking Questions

The special procedural safeguards outlined in Miranda are required when a suspect in custody is subjected to interrogation. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). An act of interrogation encompasses "any words or actions" on the part of law enforcement agents that are "reasonably likely to elicit an incriminating response." Id. at 301.

The Supreme Court recognized a narrow "routine booking question" exception to the requirement that Miranda warnings be given before subjecting an individual to custodial interrogation. Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990). To qualify as a routine booking question, the question must be "reasonably related to the police's administrative concerns," and the Court must conclude that the question was not intended to elicit an incriminating response. United States v. Brotemarkle, 449 F. App'x 893, 896 (11th Cir. 2011). However, law enforcement may not use routine biographical questioning as a guise for obtaining incriminating information. United States v. Glen-Archila, 677 F.2d 809, 816 n.18 (11th Cir. 1982). See also United States v. Ramirez, 991 F. Supp. 2d 1258, 1266 (S.D. Fla. 2014) (holding that the response to a question about how long the defendant had lived at the residence being searched was inadmissible); United States v. Peterson, 506 F. Supp. 2d 21, 25 (D.D.C. 2007) (suppressing the response to a question pertaining to which bedroom belonged to the defendant during the execution of a search warrant because it went beyond the booking question exception).

4

## FINDINGS OF FACT

### I. Testimonial and documentary evidence

1. The following witnesses testified at the October 13, 2017 evidentiary hearing: IRS Special Agent Stacy Perez ("Agent Perez"), IRS Supervisory Special Agent Wazerah Allen ("Agent Allen") and Choute. The undersigned finds the testimony of Agent Perez and Agent Allen credible. The undersigned finds the testimony of Choute not to have been entirely credible.

2. The following document was admitted into evidence: Government Exhibit 1.

### II. Facts

#### A. *Agent Perez*

3. The IRS identified an Internet Protocol ("IP") address that was used to file over 100 tax returns that had indicators of fraud.

4. Agent Perez obtained a search warrant for the residence that was associated with that IP address, namely, 565 N.E. 158th Street, Miami, Florida (hereafter, "the Residence").

5. Prior to executing the search warrant, Agent Perez conducted surveillance of the Residence and researched its potential residents.

6. Agent Perez's research revealed that potentially eight individuals lived at the Residence, including Choute.

7. Agent Perez's surveillance revealed that one of the residents typically left the Residence between 5:30 A.M. and 6:00 A.M. and that the Residence had a metal gate over the front door.

8. On March 15, 2016, Agent Perez led a team of law enforcement officers in executing the search warrant.

9. Between 5:30 A.M. and 6:00 A.M., Agent Perez observed Choute's brother, Kerby Choute ("Kerby"), exit the Residence and drive away.

10. Two North Miami Beach task force officers followed Kerby and stopped him at 167th Street at approximately 5:55 A.M.

11. Agent Perez went to the location where Kerby was stopped and informed Kerby that she had a search warrant for the Residence, and that the IRS was investigating tax returns that had been filed using an IP address associated with the Residence.

12. Kerby told Agent Perez that Choute was the only individual present at the Residence at that time.

13. Agent Perez informed Kerby that she did not want to breach the metal gate of the Residence and asked him if he would provide her with the key to the front door.

14. Kerby provided Agent Perez with a key to the metal gate, a key to the front door and a key to his bedroom door.

15. Kerby also told Agent Perez that he lived at the Residence with his mother, his father, his older brother, and his younger brother.

16. Kerby also described to Agent Perez the layout of the Residence, including who resided in each bedroom.

17. Kerby specifically told Agent Perez that his bedroom was on the right side of the house on the right side; his younger brother's bedroom was on the opposite side of his bedroom; his older brother's bedroom was at the back of the house; and his parents' bedroom was on the right side of the house.

18. Based on this interaction, Agent Perez had an idea as to which bedroom might belong to Choute before she entered the Residence.

6

19. When Agent Perez returned to the Residence, she used Kerby's key to open the metal gate over the front door and knocked and announced approximately three times, but there was no response.

20. At approximately 6:10 A.M., Agent Perez used the key to open the front door.

21. Approximately sixteen law enforcement officers, including Agent Perez, entered the Residence at that time.

22. All of these law enforcement officers were armed, which was standard procedure.

23. One officer was armed with an AR-15 assault rifle, and the others were armed with 9-millimeter Glocks.

24. According to Agent Perez, the general procedure when executing a search warrant is that a law enforcement officer has his or her firearm out of the holster when entering the premises being searched, unless he or she is tasked with watching the inhabitants of the residence.

25. Upon entering the Residence, Agent Perez had her firearm out of the holster when she saw Choute approaching the front door.

26. Agent Perez instructed Choute to exit the Residence and passed him over to the team of law enforcement officers behind her until he was outside.

27. At this point, Agent Perez did not tell Choute that he was free to leave.

28. When executing a search warrant, it was Agent Perez's standard practice to remove everyone from the residence, regardless of whether they were affiliated with the crime.

29. After Choute was removed from the Residence, the agents searched inside for other people but did not find anyone else.

30. At approximately 6:40 A.M., Agent Perez and Agent Allen went outside and found Choute sitting on the front lawn. There were two law enforcement officers watching Choute to ensure that he did not leave.

31. Choute was not handcuffed while he was sitting on the front lawn or at any other point during the search.

32. Agent Perez and Agent Allen told Choute to follow them from the area where he was seated to another area in the front yard.

33. Agent Perez asked Choute the questions memorialized in the Memorandum of Interview. See Memorandum of Interview [D.E. 16-1 at 2].

34. According to Agent Perez, the purpose of asking Choute about the location of his bedroom was to identify which room was his and gather information about him.

35. Agent Perez then explained to Choute why the law enforcement officers were there and told Choute about the IP address associated with the Residence.

36. At that point, Choute requested an attorney, and Agent Perez stopped the Interview at approximately 6:45 A.M.

37. At no point during the Interview did Agent Perez brandish her firearm, raise her voice, make any threats, lie, or try to trick Choute.

38. After the Interview was over, Agent Perez told Choute that he could not go into the Residence, but that he was free to leave.

39. After the Interview, law enforcement officers began searching the Residence for evidence.

40. The officers found a book bag with Choute's name on it, inside of which were approximately four notebooks containing handwritten names, social security numbers, and dates of birth. See Gov't Ex. 1.

41. The book bag was found in the room on the right side of the Residence on the left side. In that room, agents also found a laptop computer, an iPad and several temporary automobile tags.

42. During the search, agents also found keys to Choute's black Infiniti Q50 inside the Residence and subsequently seized the vehicle.

43. The undersigned accepts Agent Perez's testimony as an accurate description of her participation in the events of March 15, 2016.

## B. Agent Allen[2]

44. After Choute was brought out of the Residence, the law enforcement officers conducted a search for other people to make sure that the location was deemed safe.

45. According to Agent Allen, an initial search of this type would take 2-5 minutes.

46. Some time after the search, Agent Allen came outside and encountered Choute on the front lawn with Agent Perez.

47. In addition to the questions memorialized in the Memorandum of Interview, Agent Allen and Agent Perez also asked Choute where his family members were and when he expected them to return.

48. According to Agent Allen, for safety reasons it would be good information for law enforcement officers to know whether they could expect someone to show up at the Residence while the search warrant was being executed.

---

[2] Agent Allen's testimony regarding the preparation for the search warrant and the initial entry into the Residence was consistent with Agent Perez's testimony. Any material additions or clarifications are stated below.

9

49. At no point during the Interview did Agent Allen use any force, raise her voice, threaten, lie, or try to trick Choute.

50. After the Interview, Agent Allen observed Choute sitting on the front lawn and walking around the front of the Residence.

51. On cross examination, Agent Allen testified that she did not recall telling Choute that he was free to leave.

52. The undersigned accepts Agent Allen's testimony as an accurate description of her participation in the events of March 15, 2016.

### C. Choute

53. The first law enforcement officer Choute saw enter the Residence was Agent Perez.

54. When the officers entered the Residence, they had their guns drawn.

55. Choute testified that officers grabbed him and placed him on the front lawn, and an officer told him to sit down and not to move.

56. While Choute was sitting on the front lawn, no officer pointed a gun at him, threatened him, used physical force against him, or lied to him.

57. Agent Perez and Agent Allen came to where Choute was sitting and moved him from the front lawn to the sidewalk, where they conducted the Interview.

58. During the Interview, neither Agent Perez nor Agent Allen touched Choute, used any force against him, yelled or raised their voices at him, handcuffed him, acted rudely toward him, or used lies, threats or tricks.

59. Choute initially testified that when the Interview ended, the conversation between him and Agent Perez and Agent Allen also ended. Choute later testified, however, that after the

Interview ended, both Agent Perez and Agent Allen told him that he had to go back to the front lawn.

60.     Due to this inconsistency and having observed Choute's demeanor while testifying, the undersigned finds that Choute was not entirely credible.

## CONCLUSIONS OF LAW

As noted above, the Motion to Suppress is only directed at Items 10-13 from the Interview. See Memorandum of Interview [D.E. 16-1 at 2]. Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

The totality of the circumstances demonstrates that Choute was not in custody at the time of the Interview. At no point in the time immediately preceding the Interview did any law enforcement officer point a gun at Choute, threaten him, or use physical force against him.[3] See Barry, 479 F. App'x at 299. During the Interview itself, neither Agent Perez nor Agent Allen brandished their weapons, touched or handcuffed Choute, or raised their voices. Id. Further, the Interview lasted approximately five minutes and took place on Choute's front lawn, a "familiar or at least neutral" setting. See Luna-Encinas, 603 F.3d at 882. Therefore, even though he was not explicitly told that he was free to leave until after the Interview ended, a reasonable person in Choute's position would not have felt a restraint on his freedom of movement of the degree associated with a formal arrest such that he would not feel free to leave prior to or during the Interview. Street, 472 F.3d at 1310; McDowell, 250 F.3d at 1362. Hence, there was no requirement to administer Miranda warnings prior to the Interview. Luna-Encinas, 603 F. 3d at 882. Accordingly, the answers to Items 10-13 are not subject to suppression. See id.

---

[3] Although two officers were watching Choute to ensure that he would not leave, neither of them pointed a gun at him, and their subjective intent is irrelevant. See Moya, 74 F.3d at 1119 ; Berkemer, 468 U.S. at 442 (An officer's "unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time.") (citations omitted).

11

Given the conclusion that Choute was not in custody, it cannot be said that he was subjected to custodial interrogation. Therefore, the routine booking question exception need not be considered. Nevertheless, the undersigned finds that the questions asked in Items 10-13 did not fall within the ambit of routine booking questions because they were not reasonably related to the agents' administrative concerns. Brotemarkle, 449 F. App'x at 896; Ramirez, 991 F. Supp. 2d at 1266.

## RECOMMENDATION

In accordance with the foregoing, the undersigned respectfully recommends that Choute's Motion to Suppress be DENIED. Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Miami, Florida this 26th day of October, 2017.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: United States District Judge Jose E. Martinez
      Counsel of Record